**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Valentin Zarate Diaz, | No. CV-19-03183-PHX-DWL |
| Petitioner, | **ORDER** |
| v. | |
| Laura Andrea Rios Ibarra, | |
| Respondent. | |

**INTRODUCTION**

Valentin Zarate Diaz ("Father") and Laura Andrea Rios Ibarra ("Mother") are the parents of Son V, a minor child. On May 16, 2019, Father filed a petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, which implements the provisions of the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"). (Doc. 1.) The petition alleges that Mother improperly removed Son V from Mexico at some point between August 31 and September 3, 2018, and took him to live with her in Arizona. The petition requests, among other things, that the Court "[o]rder immediate return of Son V to [Father] or to an agent of [Father]." (*Id.* at 14.)

**FINDINGS OF FACT**

The parties agreed to forgo an evidentiary hearing and instead submit this case on the briefs. (Doc. 23.) Accordingly, the following findings of fact are based on Father's Petition (Doc. 1), Mother's answer (Doc. 21), the documents included as attachments to

the parties' briefs (Docs. 26-1, 26-2, 27-1), and other undisputed facts appearing in the parties' briefs:

Father and Mother are both citizens of Mexico. (Doc. 1 ¶¶ 10-11; Doc. 21 ¶¶ 10-11.) They have never been married. (Doc. 1 ¶ 14; Doc. 21 ¶ 14.) They are the parents of Son V, who was born in Mexico in February 2012. (Doc. 1 ¶ 16; Doc. 21 ¶ 16.)[1] They "intermittently lived together for several months when Son V was an infant" but "have not lived together since September 2014." (Doc. 26-1 at 49 ¶ 4.) Their relationship was "tumultuous." (Doc. 26-1 at 63 ¶ 7.) Following their break-up, Son V resided with Mother (in a house owned by Father)[2] but Father remained actively involved in Son V's life. (Doc. 1 ¶ 16; Doc. 21 ¶ 16.)

On November 19, 2015, Father and Mother entered into an agreement addressing their respective rights concerning Son V (the "Agreement"). (Doc. 1 ¶ 19; Doc. 21 ¶ 19; Doc. 26-1 at 7-9.) The parties have provided a Spanish-to-English translation of the Agreement, which contains the following five clauses:

(1)    Father must pay "Child Support [in] the amount equal to . . . 20%" of Father's wages.

(2)    The parties agree that "the days of cohabitation with [Father] will be any day of the week within a prudent schedule for the child, provided that [Father] doesn't come in an inconvenient state, and that he doesn't interrupt the child's chores," and further agree that if either party has "an event that requires the child, they will have no inconvenient."

(3)    "[T]he address where the child will reside will be [a particular house in Sonora, Mexico] where the child currently lives with [Mother]."

(4)    Father must pay 60% of Son V's tuition and Mother must pay 40%.

---

[1]    Mother's declaration states that Son V was born on February 12, 2013. (Doc. 26-1 at 63 ¶ 6.) However. Father's declaration provides a birth date of February 3, 2012 (Doc. 26-1 at 49 ¶ 3), and Mother admitted in her answer that paragraph 4 of the Petition (which also alleges a 2012 birthday) is accurate. (Doc. 21 ¶ 4.)

[2]    Specifically, Son V and Mother resided together from December 2013 until the fall of 2018 in a home in Sonora, Mexico that is owned by Father. (Doc. 1 ¶¶ 20, 21; Doc. 21 ¶¶ 20, 21.)

(5) "In the matter of school vacations, these will be open for both parties, that is to say, they have no objection in both sharing th[ese] holidays, and in Christmas vacations, the child will spend the 25th with [Mother] and from the 26 of December to January 02 of 2016, the child will spend it with [Father] . . . [during which time] the child will be under the care of [Father] in his home, in the understanding that if they go out of the city, it must be upon request of [Mother]."

(Doc. 26-1 at 7-9.) Additionally, the Agreement contains a provision certifying that "everything relating to the present agreement, is su[b]mitted to the jurisdiction of the pertinent judge of this judicial district" and concludes with a joint request by Mother and Father for the Agreement to be "su[b]mitted to the Judge of First Instance in Family Matter . . . for its revision and approval in the terms of the [laws of] the State of Sonora." (*Id.*)

On two different occasions in July 2018, Son V spent 10 days with Father—the first during a vacation with Father to Puerto Vallarta and the second when Mother traveled to the United States. (Doc. 26-1 at 51 ¶ 14.)[3]

On August 23, 2018, Mother requested that Father sign a passport application for Son V to travel to the United States. (Doc 1 ¶ 24; Doc. 21 ¶ 24.) Father refused to sign it. (Doc. 1 ¶ 25; Doc. 21 ¶ 25.)

Sometime between August 31, 2018 and September 3, 2018, Mother moved with Son V to the United States. (Doc. 1 ¶ 28; Doc. 21 ¶ 28; Doc. 26-1 at 64 ¶ 17.) Father did not consent to Mother's removal of Son V from Mexico. (Doc. 26-1 at 50 ¶ 6.) Mother's purpose in moving to the United States was to accept a job offer to work as a civil engineer at an engineering firm in Arizona. (Doc. 26-1 at 63-64 ¶¶ 2, 13-14.)

On September 12, 2018, Father filed a "Motion to Enforce Agreement" with the family court in Sonora, Mexico. (Doc. 26-2 at 48-56 [translated version of document].) Among other things, Father argued in this motion that Mother had violated the third clause

---

[3] Although Father did not provide any documentary evidence to prove these visits actually occurred—he simply refers to the visits in his declaration—Mother did not dispute the existence of these visits in her declaration.

in their Agreement, which required Son V to reside at a particular home in Sonora, Mexico. (*Id.* at 51.)  Father also stated in the motion that "it is true that [Mother] can freely decide where she will live with my minor child" and argued that the violation of the third clause arose from Mother's "refus[al] to give me true and necessary information of her whereabouts for me to exercise my rights as a parent."  (*Id.*)[4]

On October 3, 2018, Mother called Father from the United States.  (Doc. 1 ¶ 34; Doc. 21 ¶ 34.)  During this call, Father spoke to Son V.  (*Id.*)

On or about October 15, 2018, the Mexican family court denied the "Motion to Enforce Agreement" that Father had previously filed.  (Doc. 27-1 at 38.)  The court's rationale for denying the motion was that "considering the drastic change in circumstances, ([Mother's] address), it is not materially possible to enforce the agreement regarding parenting time the way the moving party is requesting."  (*Id.*)

On October 17, 2018, Mother filed a "Notice of Relocation" with the Mexican family court.  (Doc. 26-1 at 64 ¶ 17 [Mother's declaration]; Doc. 26-2 at 59 [translated version of document].)  This notice explained that Mother had moved to the United States for "personal and professional reasons."  (*Id.*)

On October 18, 2018, Father filed a "Motion to Revoke" the order denying his motion to enforce.  (Doc. 27-1 at 38-39.)

On October 23, 2018, the Mexican family court issued an order denying the "Motion to Revoke."  (Doc. 27-1 at 40-42.)  In this order, the court explained that it hadn't denied Father's previous motion for any merits-based reason—instead, it had denied the motion because Mother's relocation to the United States meant that "it is not possible to effectuate the enforcement of the agreement . . . by virtue of the fact that the minor child no longer lives in the home where it was agreed he would be placed."  (*Id.* at 41.)  The court further clarified that Father's "rights are preserved and he may exercise them in the appropriate procedure and form."  (*Id.*)

---

[4]     The quoted text is fully capitalized in the translated version of the motion, but the Court has eliminated the capitalization here for ease of reference.

On November 24, 2018, Mother and Son V "arrived unannounced at [Father's] place of work in Nogales, Sonora, Mexico." (Doc. 1 ¶ 39; Doc. 21 ¶ 39; Doc. 26-1 at 65 ¶¶ 23-24.) Father ended up spending about one hour with Son V. (Doc. 1 ¶ 41; Doc. 21 ¶ 41.) After this visit was complete, Mother returned to the United States with Son V. (*Id.*)

In January 2019, Mother (unaccompanied by Son V) visited Father at his parents' home in Mexico, where she again requested that Father sign Son V's passport application. (Doc. 1 ¶ 45; Doc. 21 ¶ 45; Doc. 26-1 at 65 ¶ 28.) Father again refused to sign it. (*Id.*)

On July 9, 2019, Mother filed a "Motion to Modify Parenting Time With Our Minor Child" with the Mexican family court. (Doc. 26-1 at 65 ¶ 31 [Mother's declaration]; Doc. 26-2 at 11-16 [translated version of document].) In this motion, Mother described the Agreement as a document that "established parenting time between non-custodial parents and our child." (*Id.* at 12.)

## LEGAL STANDARD

"A court that receives a petition under the Hague Convention may not resolve the questions of who, as between the parents, is best suited to have custody of the child." *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). Instead, the court must begin its analysis by determining whether "the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). The petitioner—here, Father—bears the burden of proof on this issue and must prove it by a preponderance of the evidence. *Id.*

To determine whether the removal/retention was "wrongful," a district court must answer a series of four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

If the Court answers these questions in the petitioner's favor, the burden shifts to the party opposing the return of the child—here, Mother—to prove "by clear and

convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies." *Id.* § 9003(e)(2)(A).

## CONCLUSIONS OF LAW

The only disputed legal issue in this case concerns the third element of the *Mozes* test—whether Mother's removal of Son V from his state of habitual residence (Mexico) on or around August 31, 2018 (the date of the removal) violated the "rights of custody" that were attributed to Father under the laws of the state of habitual residence. (Doc. 23 [parties' stipulation]; Doc. 27 at 4 [Mother's brief: "Here, the parties agree the only issue in dispute is the third question. As a result, the return of Son V is only mandated if rights of custody are attributed to Father under the law of the habitual residence."].)

I.      Rights Of Custody

Under the Convention,[5] "rights of custody" are distinguished from "rights of access." Article 5 of the Convention defines these distinct rights[6] as follows:

     a)      "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

     b)      "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

*Id.* Article 3 of the Convention further provides that "rights of custody . . . may arise in particular [1] by operation of law or [2] by reason of a judicial or administrative decision, or [3] by reason of an agreement having legal effect under the law of [the state of habitual residence]."

The seminal decision addressing the meaning of the term "rights of custody" under the Convention is the Supreme Court's 2010 decision in *Abbott v. Abbott*, 560 U.S. 1

---

[5]     The Convention is available at https://assets.hcch.net/docs/e86d9f72-dc8d-46f3-b3bf-e102911c8532.pdf.

[6]     This distinction is significant—the Court doesn't have authority to order the return of a child if a parent's mere rights of access have been violated. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) ("The Convention also recognizes 'rights of access,' but offers no return remedy for a breach of those rights.").

(2010). There, a couple living in Chile separated when their son was eight years old. *Id.* at 5-6. In response, "[t]he Chilean courts granted the mother daily care and control of the child, while awarding the father 'direct and regular' visitation rights, including visitations every other weekend . . . ." *Id.* Additionally, "Chilean law conferred upon [the father] what is commonly known as a *ne exeat* right: a right to consent before [the mother] could take [the child] out of Chile." *Id.* at 6. After the mother removed the child to the United States without the father's permission, the father filed an ICARA petition in federal court. *Id.* at 7. The district court and Fifth Circuit both ruled against the father, reasoning that his *ne exeat* right was only a "veto right" and not a true "right of custody." *Id.* The Supreme Court reversed. Although the Court acknowledged "[t]hat a *ne exeat* right does not fit within traditional notions of physical custody," it emphasized that the Convention adopted a "broad definition" of the term "rights of custody" that is capacious enough to encompass "[j]oint legal custody, in which one parent cares for the child while the other has joint decisionmaking authority concerning the child's welfare." *Id.* at 12. The Court also stated that it would be "illogical and atextual" to characterize *ne exeat* as a mere "right of access" because "the joint right to decide a child's country of residence is not even arguably a 'right to take a child for a limited period of time.'" *Id.* at 14 (citation omitted).

II.     The Agreement

Father and Mother entered into the Agreement on November 19, 2015, establishing "the terms of care and cohabitation" related to Son V. (Doc. 26-1 at 7-10.) As noted, the Agreement contains five provisions regarding the parties' rights and obligations. (*Id.* at 7).

Father argues the Agreement establishes rights of custody. (Doc. 26 at 8-9.) According to Father, "[t]he Agreement establishes the mutually determined joint parenting plan inclusive of how the parties planned to care for and share time with Son V, as well as where he would live." (*Id.*) Father also argues the Agreement shows he has rights of custody because it memorializes "rights relating to the care of the person of the child" and "the right to determine the child's place of residence." (*Id.*)

Mother argues the Agreement only establishes rights of access for Father. (Doc. 27

at 5-6.) Mother notes that the Agreement only permits Father to see Son V during holidays and vacations and requires him to seek Mother's permission to take Son V out of the city. (*Id.*) The Agreement also gives custody to Mother every day of the week and, although Father's time with Son V "will be any day of the week," Father must exercise this time "within a prudent schedule," Father must not "come at an inconvenient time," and Father must not "interrupt Son V's chores." (*Id.*)

The Court agrees with Father. The Agreement's key provision is its third clause, under which Mother and Father jointly agreed that "the address where the child will reside will be" the home owned by Father in Sonora, Mexico, which is the "place where the child currently lives with [Mother]." (Doc. 26-1 at 7.) The necessary implication of this clause is that Mother is precluded from unilaterally moving Son V into a different residence within Mexico—let alone to a different country—without Father's permission.[7] If a *ne exeat* right constitutes a "right of custody" for purposes of the Convention, it follows that Father's rights under the Agreement—which go further than a *ne exeat* right, because the Agreement implicitly prohibits even the intra-country relocation of Son V by Mother—is a "right of custody," too.

Admittedly, Father previously stated, in a motion he filed in Mexican family court in September 2018, that "it is true that [Mother] can freely decide where she will live with my minor child." (Doc. 26-2 at 51.) This language, when viewed in isolation, is difficult to reconcile with Father's argument that he has a *ne exeat*-style right to veto any effort by

_____

[7]     This interpretation is bolstered by the declaration from Father's expert on Mexican law, Eduardo Chavez Chavez, who opined that the Agreement "provide[s] that both parents agree to the harmonious joint parenting of their child, *agreeing that their son would live in the city of Nogales, Sonora (not another place)*, and that [Father] could interact with their son any day of the week." (Doc. 26-1 at 26 ¶ 13, emphasis added.) The Court finds this interpretation, and Mr. Chavez, to be credible. In contrast, the Court does not credit the submission by Mother's expert on Mexican law, Jesus Ivan Lopez Serrano, who opined in part that "if [Mother] . . . needed to change her residence to another city or another country, she was under no obligation to ask [Father] for authorization or permission." (Doc. 26-2 at 32.) In reaching this conclusion, Mr. Serrano stated that "there [is] no clause in the Agreement requiring that Mother apply for or require permission to change her residence to another city or country." (*Id.* at 34.) Yet as discussed above, the third clause of the Agreement does just that—it requires Mother and Son V to reside in a particular house in Sonora, Mexico. Mr. Serrano does not specifically acknowledge this clause in his opinion letter, much less attempt to reconcile his opinion with it.

Mother to relocate Son V without his permission. Nevertheless, Father persuasively argues that the quoted language must be viewed in the context of when and how it was presented—specifically, as part of a "Motion to Enforce Agreement" that sought to compel Mother to return Son V to Mexico. (Doc. 26 at 8 n.5.) Thus, the quoted language should not be viewed as some sort of binding judicial admission that can override the plain language of the Agreement, which requires Mother to reside with Son V in Mexico.

Finally, there is no merit to Mother's contention that "there have been two judicial decisions by a Sonora court holding that Father does not have custody rights under the Agreement." (Doc. 28 at 2-3.) The Mexican family court denied Father's motion to enforce and motion to vacate on procedural grounds, not because it found that Mother had the unilateral right under the Agreement to relocate Son V to another country without Father's permission. Moreover, in the order of October 23, 2018, the Mexican family court specifically noted that the Agreement contains a provision requiring Son V to "live[] in the home where it was agreed he would be placed." (Doc. 27-1 at 41.)

III.    *Patria Potestas*

  A.    ***Patria Potestas* Defined**

Father also argues that the Mexican doctrine of *patria potestas*, or parental authority, grants him a right of custody by operation of law. [8]

"The doctrine of *patria potestas* has its roots in Roman law, where it conveyed absolute and despotic rights of a father over his children; today, in Mexico, the doctrine regulates relations between parents and children until the latter reach the age at which they must fend for themselves." *Gonzalez v. Preston*, 107 F. Supp. 3d 1226, 1234 (M.D. Ala. 2015) (citations and internal quotation marks omitted). *Patria potestas* "constitutes the 'most comprehensive' right that a parent can exercise over the person and property of his or her minor children." *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 624 (W.D. Tex. 2012)

---

[8]  Although Father has met his burden of showing he possessed a right of custody under the Agreement—which means his ICARA petition must be granted—the Court will also address his alternative theory of custody (*i.e.,* he had a right of custody by operation of law) so the parties have a complete record in the event of an appeal.

(citations omitted). It "establishes the parent's bundle of rights over a minor child, one of which is formal custody, but it also includes the right to care for the child and make decisions about his or her life." *Preston*, 107 F. Supp. 3d at 1234. *See also* Patricia Begné, Parental Authority and Child Custody in Mexico, 39 Fam. L.Q. 527, 531 (2005) ("[*Patria potestas*] places a series of correlative rights and obligations on the holder of [*patria potestas*], such as custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, etc.") (citation omitted).

The Mexican State of Sonora—which was the habitual residence of Son V at the time of his removal—codifies the doctrine of *patria potestas* in its Family Code ("the Code"). The Code defines *patria potestas* (in the Code, referred to as "parental authority"[9]) generally as "a set of rights and obligations granted and legally binding on parents, or grandparents where appropriate, to fulfill the obligations to feed, protect, and raise their descendants, and to appropriately manage their assets." Code art. 308 (found at Doc. 26-1 at 18.)[10] More specifically, one who has *patria potestas* over a child is required "to protect and educate [the child] properly" and "observe the [child] and educate [the child] to obey the rules of social coexistence." Code art. 317 (found at Doc. 26-1 at 20.) That person also has "the faculty to admonish and correct, avoiding always cruel and unnecessary punishments." *Id.*

B. **Whether Father Waived *Patria Potestas* Rights Under The Agreement**

Mother argues that *patria potestas* doesn't apply here because the parties have a custody agreement and this agreement doesn't expressly incorporate *patria potestas*. (Doc. 27 at 4-5.) Mother cites *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002), in support of this argument. Father disagrees, arguing that *patria potestas* can't be waived and "direct

---

[9] For uniformity, the Court has changed references to "parental authority" in the Code or other sources to "*patria potestas*."

[10] Father and Mother cited differing translations of Article 308. Mother, in her response brief, stated that Father's translation "from 2017 is outdated and does not reflect the current language provided in Article 308 as of 2019." (Doc. 28 at 5.) This distinction is immaterial because the Court's ultimate conclusions would be the same under either translation of the Code.

action by the state is necessary for a parent to lose these rights." (Doc. 26 at 5-8.) Therefore, he contends, the Agreement couldn't have extinguished his rights. (*Id.*)

The Court agrees with Father that the Agreement didn't extinguish his *patria potestas* rights. In fact, the evidence submitted by *both* parties demonstrates that Father retains *patria potestas* rights over Son V. The Code explicitly provides that "[p]arental authority cannot be waived." Code. art. 340 (found at Doc. 26-1 at 21.) The Code also identifies various ways in which *patria potestas* can be lost or suspended—none of those include by a custody agreement. Code arts. 338, 339 (found at Doc. 26-1 at 21.) Indeed, the Code states that "[w]hen parents of a born out of wedlock child separate," as Father and Mother have done here, "both will continue to exercise [*patria potestas*]" even after an agreement on custody, child support, and visitation has been reached. Code art. 315.1 (found at Doc. 26-1 at 19-20.) Moreover, both Father and Mother's experts opined that *patria potestas* rights can only be lost or suspended by direct action of the government. (Doc. 26-1 at 25 ¶ 10 [Father's expert: "[J]ust cause is required to lose [*patria potestas*] rights, and such rights may not be waived or otherwise lost by either parent over a minor child absent direct action by the government or the State or Sonora."]; Doc. 26-2 at 32 [Mother's expert: "The Code . . . provides that the right to parent can only be suspended or lost by court order."].) Further, Father's expert explicitly opined that "the Agreement in no way causes [Father] to lose his *patria potestas* rights." (Doc. 26-1 at 26 ¶ 16.) And Mother's expert opined that "[w]herever there is an agreement on custody favoring one of the parents, the agreement does not affect at all the non-custodial parent's rights to exercise [*patria potestas*]." (Doc. 26-2 at 35.)

*Gonzalez* is not to the contrary. In that case, a Mexican couple with two young children divorced and then entered into a divorce agreement under which the mother retained sole custody of the children and agreed to live with them at a particular address in Jalisco, Mexico. 311 F.3d at 946. The father was granted limited visitation rights but was also given *ne exeat* rights. *Id.* at 947. After the mother moved the children to the United States without the father's permission, an ICARA petition was filed on the father's behalf.

*Id.* The primary issue presented in *Gonzalez* was whether the father possessed rights of custody by virtue of the *ne exeat* clause in the divorce decree. The Ninth Circuit ultimately concluded that "a *ne exeat* clause does not confer 'rights of custody' upon a parent who otherwise possesses only access rights" and thus ruled in the mother's favor. *Id.* at 954. This conclusion, of course, was reversed by the Supreme Court in *Abbott*. Finally, in the last paragraph of the opinion, the *Gonzalez* court also addressed, in somewhat brusque fashion, the father's alternative argument "that the Mexican legal concept of *patria potestas* confers upon him rights of custody under the Convention." *Id.* Although the court acknowledged that a recent First Circuit decision had recognized "that *patria potestas* conferred custody rights as understood under the Convention on both parents under Mexican law," it held that the First Circuit case was distinguishable because, "unlike the situation [there], the parties have executed a formal, legal custody agreement, thus eliminating any basis for relying on *patria potestas*." *Id.* The court concluded "that *patria potestas* does not confer 'rights of custody' upon a parent given access rights from a custody agreement." *Id.*

In Mother's view, *Gonzalez* stands for the broad proposition that, whenever Mexican parents enter into a written agreement setting forth their parental rights, they are barred from invoking *patria potestas* as an alternative basis for asserting a right of custody. Although this interpretation isn't implausible, the Court doesn't share it. The parents in *Gonzalez* were residing in the state of Jalisco at the time they entered into the divorce agreement. Here, Father and Mother were residing in a different Mexican state, Sonora, at the time they entered into the Agreement. This difference is significant because each Mexican state codifies *patria potestas* in its own civil code. *Cf. Saldivar*, 879 F. Supp. 2d at 624 (*patria potestas* "is largely governed by the civil codes of Mexican states"). Thus, the Court views *Gonzalez*'s discussion of *patria potestas* (*i.e.,* a custodial agreement's failure to mention *patria potestas* results in a waiver of *patria potestas* rights) as a narrow statement about the law of Jalisco, not a broad statement about the law of every Mexican state. *Cf. Garcia v. Pinelo*, 808 F.3d 1158, 1166 (7th Cir. 2015) (finding *Gonzalez*

distinguishable in an ICARA case arising from the state of Nuevo Leon and rejecting the argument "that *patria potestas* may be extinguished by [silence in] a custody agreement" because this argument lacks "any basis . . . in the Civil Code for Nuevo Leon"). And as discussed above, the evidence submitted by both parties demonstrates that, under the law of the state of Sonora, *patria potestas* rights can't be waived by the mere failure to mention them in a custodial agreement.[11]

Finally, *Gonzalez* is also distinguishable for a different reason. In the final sentence of the portion of the opinion addressing *patria potestas*, the court held that this doctrine "does not confer 'rights of custody' *upon a parent given access rights from a custody agreement.*" 311 F.3d at 954 (emphasis added). Here, Father wasn't given mere access rights under the Agreement—as discussed in Part II above, the Agreement provided him with a right of custody.

### C. **Whether *Patria Potestas* Is A Right Of Custody**

Because Father's rights of *patria potestas* were not extinguished by the Agreement, the Court must determine whether *patria potestas* is a right of custody.

Father argues *patria potestas* is broader than physical custody and that he retains "the right to coexist and relate with [his] child regardless of an assignment of custody," which constitutes a right of custody under the Convention. (Doc. 26 at 5.) Further, Father contends that "courts have . . . overwhelmingly held that a parent's rights under *patria potestas* are rights of custody." (*Id.*).

Mother asserts that the Code merely grants Father the right of "oversight, representation in the eyes of the law, feeding the child and managing the child's property," all of which "can be accomplished via rights of access and even from long distances." (Doc. 28 at 6.) Mother also points to Article 183 of the Code, which provides that "when

---

[11] Mother also cites *Lalo v. Malca*, 318 F. Supp. 2d 1152 (S.D. Fla. 2004), in support of her view that Father implicitly waived his *patria potestas* rights by not mentioning them in the Agreement. (Doc. 27 at 5.) But in *Lalo*, the court merely observed that "the parties' divorce decree specifically incorporates *patria potestas*, unlike the custody agreement in *Gonzalez*." 318 F. Supp. 2d at 1156. Moreover, the *Lalo* court went on to hold that "*patria potestas* amount[s] to more than a mere right of access and confers a divisible custody right." *Id.*

filing for divorce invoking any type of, children under seven years old custody will be assign to their mother." *Id.* (found at Doc. 27-1 at 73.) According to Mother, this provision means that Father doesn't have the right to decide where Son V resides. (Doc. 28 at 7.)

The Court agrees with Father that *patria potestas* constitutes a right of custody under Sonoran law. *See generally Gallardo v. Orozco*, 954 F. Supp. 2d 555, 572-74 (W.D. Tex. 2013) (surveying Sonoran law before concluding that "Petitioner has rights of custody conveyed by *patria potestad* under the laws of the State of Sonora, Mexico" and that these rights "gave Petitioner specific rights of custody as defined in the Convention"). The Code provides that "[w]hen parents of a born out of wedlock child separate, *both will continue to exercise* [*patria potestas*] but must agree on who will retain custody of the minor, as well as the way of administering child support and the right of the noncustodial parent to monitor and relate with the minor." Code art. 315.1 (found at Doc. 26-1 at 19.) A parent's rights under *patria potestas*, therefore, must be more expansive than the rights to (1) physical custody, (2) the obligation to financially support the child, and (3) right to "monitor and relate with" the child, because both parents "will continue to exercise [*patria potestas*]" after agreeing on those three items.

Such residual rights—those remaining after an agreement on those three items—are rights of custody under the Convention. *Patria potestas*, independent of which parent possesses formal physical custody, grants the parent the right to raise his or her child and make decisions on the child's behalf. *Preston*, 107 F. Supp. 3d at 1234 ("[P]atria potestas establishes the parent's bundle of rights over a minor child, one of which is formal custody, but it also includes the right to care for the child and make decisions about his or her life."); Begné, 39 Fam. L.Q. at 531 ("[*Patria potestas*] places a series of correlative rights and obligations on the holder of [*patria potestas*], such as custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, etc.") (citation omitted). Indeed, in *Gonzalez*, although the Ninth Circuit held that the father's reliance on a First Circuit case was misplaced because the parents in that case hadn't waived their *patria potestas* rights, the court didn't quarrel with the First

Circuit's general observation "that *patria potestas* conferred custody rights as understood under the Convention on both parents under Mexican law." 311 F.3d at 954. *See also Lalo*, 318 F. Supp. 2d at 1155 ("[A] fair reading of *Gonzalez* does not indicate that *patria potestas* is merely a right of access.").

The Code reflects this view. Parents exercising *patria potestas* in Sonora have the right to "raise their descendants." Code art. 308 (found at Doc. 26-1 at 18.) Even if a parent "do[es] not have custody assigned, [the parent] ha[s] the right of coexistence and to relate with [his] descendants." Code art. 315.2 (found at Doc. 26-1 at 20). Further, a parent with *patria potestas* has an obligation to "protect and educate" the child, "to admonish and correct" the child, and "educate [the child] to obey the rules of social coexistence." Code art. 317 (found at Doc. 26-1 at 20). This bundle of rights permits a parent to make decisions on behalf of his or her child.

This conclusion is in accord with numerous decisions interpreting *patria potestas* rights in other Mexican states to constitute rights of custody. *See, e.g., Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (disagreeing that "patria potestas rights are closer to what the Convention means by 'rights of access'" because *patria potestas* includes "a meaningful, decisionmaking role in the life and care of the child, and not the mere access to the child associated with visitation rights"); *Gonzalez v. Pena*, 194 F. Supp. 3d 897, 902 (D. Ariz. 2016) ("Gonzalez had custodial rights to the Children under the Mexican law doctrine of patria potestas."); *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1195 (M.D. Fla. 2016) (explaining that "[i]ncluded in [the *patria potestas*] bundle of rights is the power to determine where a child resides, which is one of the 'rights of custody' expressly recognized under Hague Convention article 5(a), and which is breached when a parent retains a child without consent"); *Aguilera v. De Lara*, 2014 WL 3427548, *2 & n.1 (D. Ariz. 2014) (concluding that "Petitioner had custody rights under Mexican law" and explaining that "[t]hese custody rights under Mexican law, referred to as 'patria potestas' recognize a parent's right to care for the child, reside with the child, and provide for the child's necessities"); *Seaman v. Peterson*, 762 F. Supp. 2d 1363, 1379 (M.D. Ga. 2011)

("*[P]atria potestas* rights are rights of custody."); *Lalo*, 318 F. Supp. 2d at 1156 ("*[P]atria potestas* amount[s] to more than a mere right of access and confers a divisible custody right.").

Mother's argument that *patria potestas* rights "can be accomplished via rights of access" misses the mark. (Doc. 28 at 6.) The question is whether *patria potestas* rights *are* rights of custody, not whether they *can be accomplished* via rights of access. As previously noted, "[t]he Convention defines 'rights of access' as 'includ[ing] the right to take a child for a limited period of time to a place other than the child's habitual residence,' and the ICARA defines that same term as 'visitation rights.'" *Abbott*, 560 U.S. at 14 (citation omitted). *Patria potestas* is more than the right to visit the child or "take [the] child for a limited period of time." It is the right to raise one's child, which includes the ability to make decisions for the child.

Finally, Mother's reliance on article 183 of the Code is unavailing. Although Mother's expert opined that "a mother who has sole custody of the child does not require permission or authorization of the non-custodial parent to change her residence, be it to a different city or country" and that "[t]he rights of the non-custodial parent consist only of having oversight over the child and spending parenting time with him" (Doc. 27-1 at 59-60), this interpretation of *patria potestas* rights for a non-custodial parent is difficult to reconcile with the text of the Code and is far narrower than the interpretations of *patria potestas* found in secondary sources and the cases cited above. Moreover, there is a legitimate question whether Mother's expert cited inapplicable and/or overruled law in reaching some of his opinions. (Doc. 26-1 at 26-27 [Father's expert's opinion that "[t]he statutory law produced by [Mother's] counsel (again, specifically. Article 4.228) is controlling only in the State of Mexico. Regardless, the Supreme Court for Mexico declared in 2017 that laws that provide a preference for women with regard to the raising or children, such as Article 4.228, are unconstitutional because men and women are viewed equally under Mexico's Constitution"].)

…

Accordingly, **IT IS ORDERED** that:

      (1)     Father's petition (Doc. 1) is **granted**;

      (2)     Mother shall return with Son V to Mexico within 14 days of this order;[12]

      (3)     The Clerk of Court shall enter judgment accordingly and terminate this case; and

      (4)     Father may file a motion for expenses, as requested in the Petition (Doc. 1 at 6) and as authorized by Article 26 of the Convention and 22 U.S.C. § 9007(b)(3), within 14 days of entry of this order.

      Dated this 13th day of September, 2019.

_____
Dominic W. Lanza
United States District Judge

---

[12]     In her brief, Mother stated that "if the Court ultimately holds that Son V must return to Mexico, Mother will quit her job in Phoenix, Arizona, and return to live in Sonora with Son V . . . . In fact, Mother would request that any holding that orders the return of Son V include maintaining Mother's physical custody of Son V." (Doc. 27 at 8.) The requirement that Mother "return with Son V to Mexico within 14 days of this order" is intended to be consistent with this request.